

EXHIBIT
A

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

NEPTUNE SHIPMANAGEMENT
SERVICES (PTE), LTD., TALMIDGE
INTERNATIONAL LTD.,
AMERICAN EAGLE TANKERS,
INC., LTD., AMERICAN EAGLE
TANKERS AGENCIES, INC., AND
THE BRITANNIA STEAM SHIP
INSURANCE ASSOCIATION LTD.

CIVIL ACTION NO.  20-1525

JUDGE FELDMAN

VERSUS

VINOD KUMAR DAHIYA

MAGISTRATE JUDGE VAN
MEERVELD

## STATEMENT OF TRUTH/DECLARATION

1. I, Nishant Rao, Advocate, am over 18 years of age and am competent to make this Declaration based on my personal knowledge.

2. I am an Advocate enrolled to practice as an Advocate under the Rules of the High Court of Delhi at New Delhi, India with Bar Council No. D-4673 of 2016.

3. Agarwal Law Associates, a law firm based at New Delhi was retained by the owners of the M/V EAGLE AUSTIN to represent them before the Sole Arbitrator in relation to the arbitration claim brought by Mr. Vinod Kumar Dahiya in India relative to personal injuries he allegedly sustained while working aboard that vessel in November, 1999. I work with Agarwal Law Associates.

4. Mr. Dahiya's claims proceeded to independent arbitration in India pursuant to the terms of his employment contract, or Deed, which was duly executed by Mr. Dahiya on or about 13 September 1999.

5. An independent arbitrator, Ms. Justice (Retd.) Sunita Gupta, was appointed by the High Court of Judicature at New Delhi to hear and decide the claim.

6. Following proceedings in India before Justice Gupta, an award was issued in Mr. Dahiya's favor (hereinafter, the "Award").



7. I hereby certify that the copy of the Award attached to this Declaration as Exhibit 1 is a true, complete and accurate copy of the Award.

8. Soon after the Award was issued, I corresponded with Mr. Dahiya's advocates in India and attempted to obtain their agreement on the amounts due under the Award, particularly the unliquidated interest and costs due to Mr. Dahiya.  In this correspondence, I have communicated that my clients desire to satisfy the Award in full and have asked Mr. Dahiya's advocates to give me their calculations of the total amount of Award.

9. Mr. Dahiya's advocates never confirmed to any amount and kept delaying my request.

10. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 5th day of August, 2020.

NISHANT RAO

ATTESTED

Valid Outside of India

NOTARY DELHI (INDIA)

0 5 AUG 2020

NOTARY

K. BANDANA
Delhi
Regd. No. 19718

GOVT. OF INDIA

My Term Expired on Dated
26/2/2025

2



# INDIA NON JUDICIAL

## Government of National Capital Territory of Delhi

### e-Stamp

सत्यमेव जयते

| | | |
|---|---|---|
| Certificate No. | : | IN-DL07936309585412S |
| Certificate Issued Date | : | 10-Jan-2020 11:46 AM |
| Account Reference | : | IMPACC (SH)/ dlshimp17/ SAKET/ DL-DLH |
| Unique Doc. Reference | : | SUBIN-DLDLSHIMP1724718659428582S |
| Purchased by | : | SUNITA GUPTA |
| Description of Document | : | Article 12 Award |
| Property Description | : | Not Applicable |
| Consideration Price (Rs.) | : | 0 (Zero) |
| First Party | : | SUNITA GUPTA |
| Second Party | : | Not Applicable |
| Stamp Duty Paid By | : | SUNITA GUPTA |
| Stamp Duty Amount(Rs.) | : | 100 (One Hundred only) |



......................................Please write or type below this line......................................

**BEFORE MS. JUSTICE (RETD.) SUNITA GUPTA**
**SOLE RBITRATOR**
**AT DELHI INTERNATIONAL ARBITRATION CENTRE (DIAC)**
<u>**Case Ref. No. DAC/1512/01-17**</u>

MR. VINOD KUMAR DAHIYA                    ...CLAIMANT

**VERSUS**

NEPTUNE SHIP MANAGEMENT
SERVICES (PTE.) LTD.                    ...RESPONDENT

*Sunita Gupta*

JUSTICE (RETD.) SUNITA GUPTA
SOLE ARBITRATOR

Statutory Alert:
1. The authenticity of this Stamp Certificate should be verified at "www.shcilestamp.com". Any discrepancy in the details on this Certificate and as available on the website renders it invalid.
2. The onus of checking the legitimacy is on the users of the certificate.
3. In case of any discrepancy please inform the Competent Authority.

**BEFORE MS. JUSTICE (RETD.) SUNITA GUPTA**
**SOLE RBITRATOR**
**AT DELHI INTERNATIONAL ARBITRATION CENTRE (DIAC)**

### Case Ref. No. DAC/1512/01-17

**MR. VINOD KUMAR DAHIYA**            **...CLAIMANT**

**VERSUS**

**NEPTUNE SHIP MANAGEMENT**
**SERVICES (PTE.) LTD.**            **...RESPONDENT**

### AWARD ARISING OUT OF OMP (MISC.) (COMM) 178 OF 2018

### 25.01.2020

### Case of the Claimant:

1. The Claimant is an Indian citizen currently residing at Faridabad. He completed his 1st year from International Maritime Institute Ltd, New Delhi in 1999. In September 1999, he joined the Respondent for completion of his practical training for twelve months as an Engine Cadet on board the Respondent's vessel namely "Eagle Austin" signing shipping articles and joining the crew at Corpus Christi, in Texas, USA. He served on that vessel as it made voyages to Mexico, Beaumont, Texas, Columbia, Lake Charles, Louisiana and Empire, Louisiana. Respondent is a foreign Company domiciled in Singapore and doing business and having affiliate offices in State of Texas, USA.

2. On 13.11.1999 when the vessel was en route from Columbia to Empire, Louisiana, USA, Claimant was instructed to dispose of certain trash by placing it in an incinerator aboard the vessel. It is the Claimant's case that some previous time, the incinerators warning devices had been disabled by the Respondent and were not reconnected even after a previous injury to another crew member and that the Claimant was directed to place trash in

incinerator (a) without supervision (b) notwithstanding Claimant's status as a trainee (c) and his supervisor's actual knowledge of the fact that the Claimant had not previously operated the incineratorand without any training or imparting any instructions in safe methods.

3. As per the Claimant, when he attempted to deposit trash in incinerator, fire flashed from the incinerator and as a direct result, he was severely burned. The initial burn injuries were sustained due to (a) disablement of the incinerator's warning device (b) the unseaworthiness of the vessel (c) due to fault and negligence on the part of the Respondent in violation of its obligations under the Jones Act and the general maritime law and other applicable laws. Reference was made to:

   (a) Incinerator had not been properly maintained, adjusted and repaired and the warning devices had been disabled.

   (b) Respondent through its employees using the incinerator prior to the Claimant had not operated it properly, by setting the controls improperly or otherwise misusing the equipment rendering it hazardous to operate.

   (c) Claimant's supervisors failed to warn him of the dangers involved in the use of the incinerator and failed to train him in the safe use of the incinerator or supervise his operation of the incinerator.

   (d) Respondent failed to provide the Claimant with safe place to work.

4. Claimant's injuries so sustained were worsened by Respondent's breach of its obligations to provide appropriate medical care. The Claimant's burns were sufficiently severe to necessitate immediate medical treatment in hospitals specializing in treatment of burns. Respondent breached this obligation too by failing to have the Claimant evacuated from the vessel immediately by helicopter.

Instead the Respondent adopted callous approach and this is evident from the fact that on being told of the extent and severity of burns and injuries sustained by Claimant, the Respondent made no efforts for Claimant's medical care. Not only this, despite being advised by a physician located in US, also employed by Respondent who recommended helicopter evacuation to a hospital in Baton Rouge specializing in treatment of burn injuries, the Captain and or the Respondent elected to keep Claimant on the vessel and treated him only with pain killers for an additional 36 hours while the vessel continued its voyage to its next scheduled port of call at Empire, Louisiana. It was only upon arrival in Louisiana territorial waters, that the medical personnel in Louisiana, recognizing that Claimant's treatment and arrangements so far made were completely inappropriate, radioed the vessel and informed the Captain that helicopter transport was required. However, vessel's captain refused stating that Respondent company was unwilling to pay for helicopter transportation. Louisiana medical personnel thereafter contacted representatives in Texas and Singapore to communicate the urgency and necessity of helicopter evacuation for Claimant. After additional delays, Respondent relented and authorized helicopter transport which was accomplished. Treatment of Claimant thus, was unnecessarily delayed for 36 hours on high seas and additionally 3 hours in Louisiana waters before helicopter transportation was accomplished requiring Claimant to undergo unnecessary pain and suffering. The additional delay in institution of intravenous antibiotics contributed to Claimants contraction of an infection which not only delayed healing process but also necessitated additional treatment which would have been unnecessary with timely evacuation and expert medication.

5.   It is the case of the Claimant that his enhanced injuries, prolonged medical treatment and avoidable physical and mental agony was directly attributable to the callousness and negligence of the Respondent and its employees. Their acts of negligence were further aggravated by their refusal to provide helicopter service for immediate evacuation and expert medical treatment. This is further aggravated by the fact that US Coast Guard could have evacuated the Claimant by helicopter without charge. As a result of above described events, Claimant sustained severe burn injuries including burn over 39% of his entire body including deep second or third degrees burns to the right elbow, forearms, right hand, fingers and thighs. These injuries required hospitalization, prolonged medication, multiple surgeries, physical therapy and follow up care.

6.   Claimant experienced extreme pain and suffering. Injuries caused to him have resulted in 27% permanent impairment to his body including physical limitations and residual problems with sweating, bleeding and itchiness, depression and chronic post traumatic stress disorder, the permanent scarring and disfigurement. The injuries caused have led to residual problems including continued psychiatric treatment.

7.   On account of Respondent not taking immediate required steps for his proper medical treatment, Claimant had to go and will still have to undergo procedures to correct the appearance of his skin.

8.   On account of the accident and the aforesaid acts of Respondent the Claimant, has and still is suffering loss in earnings and has resulted in severe disadvantage to him to lead a better life style. Because of the accident, he has still not been able to get a good job.

9.  The accident and the resultant trauma have rendered him physically unfit to attain his chosen vocational pursuits and has fatally affected his earning capacity.

10. On account of the physical and mental suffering on account of the negligent acts of the Respondent, even his chances for matrimonial alliance have become oblique with many rejections.

11. On 4.3.2002, the Claimant, being a resident of State of Louisiana, USA, had preferred a petition in the District Court of Louisiana USA, for damages against the Respondent and its related entities. Both parties led their respective evidence and carried out cross-examination of the witnesses. By Judgment dated 28.12.2004, the District Court of Louisiana, based on the evidence on record, awarded the following damages / compensation to the Claimant (a) General damages of USD 4,00,000/- (b) Future Medical Expenses to the tune of USD 50,000/- (c) Award of $75,000 in lost earnings and earning capacity as a result of the accident.

12. Aggrieved by the aforesaid judgment of the District Court, the Respondent filed an appeal. The U.S Appellate court finding that there is an arbitration clause governing the parties, by its Order dated 26.5.2006 remanded the matter back to District Court with direction to stay the matter in its entirety pending arbitration proceedings in India. However the findings so arrived at by the District Court based on the evidence on record were not set aside by the Appellate Court.

13. Consequent upon the U.S Appellate Court's Order, the Respondent appointed its own arbitrator who by his email of 30.9.2007 rejected all claims of the Claimant. Claimant was thus, constrained to file objections under Section 34 of the Arbitration and Conciliation Act, 1996 which were allowed. The award was set aside and this Tribunal was constituted by the order of 02.01.2017.

**CLAIMS BEFORE THIS ARBITRAL TRIBUNAL:**

14.   In nutshell, the Claimant's damages are comprised of past, present and future pain and suffering, permanent partial disability, loss of income, loss of earning capacity, scarring and disfigurement and past, present and future medical expenses. Following claims, thus, have been sought by the Claimant in these proceedings:

(i)   *5 Lac USD or sum equivalent to it in INR on account of extreme pain and suffering experienced by Claimant from his injuries, 27% permanent impairment to his body including physical limitations and residual problems with sweating, bleeding and itchiness, depression and chronic post traumatic stress disorder, the permanent scarring and disfigurement.*

(ii)   *50,000 USD or INR equivalent for undergoing and need to further undergo procedures to correct the appearance of his skin.*

(iii)   *75,000 USD or INR equivalent for loss of earnings.*

(iv)   *75000 USD or INR equivalent for denial of his chosen vocational pursuits.*

(v)   *13478 USD or INR equivalent towards cost for legal proceedings in the USA*

(vi)   *Cost of present arbitration proceedings.*

(vii)   *Interest @ 18% on aforesaid amounts from the date of accident.*

**CASE OF THE RESPONDENT:**

15.   The Respondent has not disputed that it is a Singapore based Company and that the Claimant as its employee was working as an Asst. Engineer/Cadet aboard Eagle Austin which was then operating in international waters under flag of Singapore. It has

however, disputed the Claimant's version of the incident and its claims by setting up the following defence:

(i) Eagle Austin was a new ship approx 1 year old furnished with modern equipments. Both vessel and equipments were well maintained and had been inspected and approved by American Bureau of Shipping. Crew of Eagle Austin was professional educated, experienced and well trained.

(ii) Incinerator and other pieces of machinery were subject to periodic inspection and they were inspected on 5.11.1999 approx 8 days before Claimant's injury on 13.11.1999.

(iii) Incinerator is designed with multiple safety controls and alarms none of which can be deactivated or circumvented.

(iv) Claimant was lowest ranking officer in engine room hierarchy. He had no specific watch standing responsibilities but was instead instructed to learn by observing other officers working as directed and studying ship board safety manuals.

(v) It was Respondent's policy prior to and at the time of Claimant's injury that assistant engineers/cadets were not to use vessel machinery including incinerator unless under direct supervision of a senior engineer or the ships electrician. This policy was discussed in weekly safety meetings which claimant was required to attend along with other members. This policy was also set out in Instruction Book for Installation Operation, Maintenance of Incinerator and had been informed to the Claimant.

(vi) Earlier on the day of his accident, Claimant was instructed to observe the electrician put garbage into and activate the incinerator. After this instruction, Claimant was left to perform other duties and he had no further duties that day with respect to incinerator. Even though Claimant had been specifically instructed by his superiors not to use the incinerator without

supervision and was strictly prohibited in the Operations Handbook, he took upon himself to do so. Without being instructed to do so and contrary to the instructions he had been given, the Claimant returned to the incinerator, opened the hopper door and poured cleaning liquids into the hopper chamber. No other member of ship's crew was present when he did so. This was misuse of the incinerator because flammable liquid was exposed to hot surface. He should have followed the instructions or asked the senior personnel.

(vii)   When Claimant was taken to Ships hospital and his condition stabilized, he was asked what happened by Ships Chief officer and Claimant replied that he had poured contents of his cleaning bucket into the incinerator and that this had flashed back and burned him. The nature and location of Claimant's burn injuries show they were caused by a burning liquid and not by flashback of flame from incinerator combustion chamber, something that was physically impossible in any case given the interlock mechanism which closed off the combustion chamber whenever the hopper chamber door was opened.

(viii)  Immediately after his injury, Claimant was helped to Ships hospital. He was able to walk there under his own power.

(ix)    Respondent maintained contingency plan for personal injuries and emergency situations. As part of that plan Respondent maintained contract with land based service i.e. "Asia Emergency Assistance (AEA)" which provided professional medical advice via radio on 24 hour basis. Master of Eagle Austin immediately contacted AEA and received directions regarding first aid and administration of medications including pain killers and antibiotics. All other instructions from AEA were immediately carried out on board.

(x)   It was Respondent's company policy that if helicopter evacuation was possible and was recommended by independent medical professionals, then it will be provided regardless of cost. In this case, medical advise given to Master was to keep the Claimant on vessel because vessel was approaching a port and there was concern that it would be more harmful to transfer the Claimant from a vessel to a helicopter.

(xi)   It was medical advise that Claimant should not be air-lifted from the vessel but should wait for the ship to dock at the port.

(xii)   The decision of when and how to evacuate the Claimant from the ship was made on the basis of the recommendations from the physicians of AEA with whom the master was in constant communication.

(xiii) When the Vessel arrived in Louisiana, Claimant was transferred by helicopter from its arrival berth to Baton Rouge Medical Centre which had most advanced burn treatment facilities in South Eastern US. Claimant was provided 1st Class medical treatment at no expense to him.

(xiv) After injury, Claimant received medical care at his employer's sole expense in US then at his home in India after he was repatriated and later in Singapore by a specialist chosen by Claimant after which he was cleared to return to work aboard ships without physical restriction of any kind.

(xv)   After period of convalesce, Claimant in fact returned to work on a vessel and was able to perform all his job functions with no physical difficulties.

(xvi) Claimant's physician in Baton Rouge confirmed that his skin grafts healed very well and that Claimant had good medical outcome. He made excellent and full recovery from his injuries. He was able to return to his former occupation on

another vessel in Respondent's management within 10 months of his injury and he was able to perform without pain and discomfort.

(xvii) In the year 2000, the Claimant returned to work on Eagle Aries, another vessel of Respondent. He was also able to perform all duties without restriction and had no ongoing problems or symptoms as a result of the accident on Eagle Austin.

(xviii) In 2001 Claimant after repeated warnings was terminated by Chief Engineer of Eagle Aries because of his refusal to follow instructions and his inability to get along with fellow crew members. Chief Engineer of Eagle Aries issued a letter dated 10.1.2001 to Claimant giving strict warning in writing for his failure to improve his conduct and to follow company guidelines and instructions from senior officers. Since there was no improvement, he was relieved from his duties and repatriated back to India. After termination from Eagle Aries, Claimant returned to US to pursue litigation.

16. Claimant filed rejoinder to the statement of defence to which a Sur-Rejoinder was filed by the respondent.

17. On the pleadings of the parties, following issues were framed on 06/03/2019:

1. Whether the incident resulting in injuries to the claimant occurred on account of any fault/omission or negligence of the Respondent ?OPC

2. Whether the parties are governed by Indian Laws or General Maritime Law and the US Jones Act? Onus on parties.

3. Whether the claimant is entitled to claim No A to E as claimed in the claim petition ?OPC

4. Whether the claimant is entitled to interest? If so, at what rate and for which period? OPC

5. Whether the claimant is entitled to cost of Arbitration Proceedings? OPC

**6. Relief:**

No other issues arose nor pressed.

18.     Counsel for the parties submitted that they will file their respective affidavits by way of evidence, however, they do not want to lead any oral evidence. It was further stated that the evidence led by the parties before the US Court be read in evidence which is already on record. Thereafter claimant filed his affidavit by way of evidence but no affidavit by way of evidence was filed by the Respondent.

19.     I have heard Ld. Counsel for the both parties at great length, perused the written submissions filed by them and the material available on record. My findings are as under:

**ISSUE NO.1:**

20.   Ld. Counsel for the claimant submitted that the parties to the present proceedings have adopted and relied upon the evidence already led by them before the Trial Court in USA. The evidence thus, to be evaluated by this Tribunal, was assessed and analyzed critically by the US Trial Court before awarding the claims to the Claimant. What is of equal importance is the fact that that the Appellate Court in US, keeping in view the arbitration clause governing the parties, has not disturbed or set aside the findings of the US Trial Court on merits but has simply remanded the matter back to District Court with direction to stay the matter in its entirety

pending arbitration proceedings in India. The relevant portion of the Judgment passed by the Appellate Court in US reads as under:

*"In the second assignment of error, the Appellants argue that the district courts award of general damages was improperly based on economic standards and legal precedent of the United States as opposed to that of India, Mr. Dahiya's native country. In their third assignment of error, the Appellants contend that the district courts award for past lost wages and future medical expenses was not supported by the evidence. Because we find that the district court improperly applied Louisiana statutory law, rather than federal law, we pretermit any discussion of the appellants second and third assignments of error that address general and special damages.........*

*For the foregoing reasons, we reverse the district court's judgment. The matter is remanded to the district court for further proceedings consistent with the reasons cited herein."*

21. It is submitted that the arguments addressed by the Respondent before the Appellate Court and the findings so arrived by the US Appellate Court would show that it did not touch the merits, the quality or the assessment of the evidence so appreciated by the US trial court but merely confined itself to the four corners of the aspect of jurisdiction of US Courts vis-à-vis the Arbitration Clause governing the parties.

22. It is further urged that while admittedly, this Arbitral Tribunal is not bound in any manner to follow or adopt the findings so arrived at by the US Court, but then there is no additional material or evidence which the parties have led or brought forward before this Arbitral Tribunal to come a conclusion that the evidence already on record was/is not sufficient to allow the claims of the Claimant. This is more particularly so, since the parties themselves, have agreed

to adopt and rely on the same set of evidence, cross examination etc which was so before the US trial Court.

23. As regards the cause of accident, Ld. Counsel for the claimant canvassed that the accident occurred and the claimant sustained injuries on account of un-seaworthiness of the vessel and the negligence on the part of the Respondent. The Claimant claims so since he was directed to place trash in incinerator (a) without supervision (b) notwithstanding Claimant's status as a trainee (c) and his supervisor's actual knowledge of the fact that he had not previously operated the incinerator nor was he required to, and without any training or imparting any instructions in safe methods.

24. It is further submitted that (a) Incinerator had not been properly maintained, adjusted and repaired and the warning devices had been disabled (b) Respondent through its employees using the incinerator prior to the Claimant had not operated it properly, by setting the controls improperly or otherwise misusing the equipment rendering it hazardous to operate (c) Claimant's supervisors failed to warn him of the dangers involved in the use of the incinerator and failed to train him in the safe use of the incinerator or supervise his operation of the incinerator (d) Respondent failed to provide the Claimant with safe place to work.

25. Reliance has been placed on the findings of the US Trial Court where it was observed that the Claimant had no formal training about the incinerator's interlock and safety features and that the incinerator was defective. Reference has been made to the following portion of the Judgment dated 28.12.2004 passed by US Trial Court:

> *"The evidence establishes that Dahiya received no formal training about the incinerator's interlock and safety features, nor did he receive any warnings about placing combustibles in the hopper area. After*

> *only one operation while Budwal watched, Dahiya was left to his own devices in the burning of garbage. Clearly, he was not properly trained in the incinerator's operation or warned of the damages inherent thereto.*
>
> *Additionally, the evidence establishes that the incinerator was defective in that the hopper flap could not be fully closed. Because the interlock system on the incinerator should have prevented its operation without the hopper flap fully closed and did not, it was possessed of a defect which contributed to Dahiya's burns."*

26. Thus, applying "res ipsa loquitor" i.e. the principle that the mere occurrence of an accident is sufficient to imply negligence **( as held in Shyam Sunder v State of Rajasthan AIR 1974SC890 )** and applying the doctrine of un-seaworthiness (as observed in **Carlisle Packaging Co. v Sandanger 259 US 255 (1922); Mitchell v Trawler 362 US 539 (1960); Drachenberg v Canal Barge Company 571 F 2nd 912 (1978); John H. Crumady v Joachim Hendrik Fisser 358 US 423 (1959); Brown v Cliff's Drilling Co. 638 F.Supp. 1009 (1986) and Villers Seafood Co. v Vest 813 F 2nd 339 (1987) )** coupled with the evidence on record establishes that the Claimant was undertaking the task expected of him, was doing so without proper instructions and training and because of defective condition of the incinerator contributed to the accident and thus, the Claimant cannot be said to be have breached the standard of care expected of him as a reasonable seaman.His conduct, in no way amounts to any negligence on his part.

Reference was made to the observation of US Judge in his Reasons for Judgment dated 28.12.2004, *"the law applicable to a*

*seaman injured in the course and scope of his employment contains a liberal causation requirement that entitles a seaman to recover if employer negligence played any part in producing the injury. An employer's negligence may arise from a dangerous condition on or about the vessel, failure to use reasonable care to provide a seaman with a safe place to work, failure to inspect the vessel for hazards, and any other breach of the employer's duty of care."*

27. Learned Counsel for the Respondent, on the other hand, has argued that (a) the ship in question was new, well maintained and had been inspected by American Bureau of Shipping etc. (b) the incinerators and other pieces of machinery were subject to periodic inspection and they were inspected on 5.11.1999 approximately 8 days before Claimant's injury on 13.11.1999. (c) the incinerator was designed with multiple safety controls and alarms none of which could be deactivated or circumvented (d) the Claimant was to blame for his own injuries inasmuch as he should not have undertaken to load flammable liquid into the incinerator without the superiors presence and that it was Claimant's own negligence that cause the malfunction of the incinerator (e) it was Respondent's policy prior to and at the time of Claimant's injury that assistant engineers/cadets were not to use vessel machinery including incinerator unless under direct supervision of a senior engineer or the ships electrician and that this policy was discussed in weekly safety meetings which claimant was required to attend along with other members.

28. **Consideration :**

It is the admitted case of the parties that Eagle Austin was a new ship with modern incinerator. However, no evidence/document has

been placed on record by the Respondent in support of its defense that the ship had been inspected by American Bureau of Shipping or that the incinerator was inspected and certified as safe by the Ship's electrician on November 5, 1999, approximately 8 days before the Claimant's injury on 13th November as alleged. In fact, in its Statement of Defence, the Respondent asserted as under:

*"The Respondent craves leave to refer and rely upon the Ship Electrician's Report dated November 5, 1999 as and when produced".*

but the said report has not been placed on record.

29. The respondent, however, has placed on record one computer generated print out marked as Defendant Ex. No. 11 before US Trial Court.  A bare perusal of the same shows that (a) it does not bear any signature or stamp of any authority verifying/certifying the contents of the same (b) it does not state as to which vessel or incinerator does it relate to (c) while the Respondent claims that the inspection was done on 5.11.1999, this alleged printout reflects inspection date as 9.10.1999. Moreover, considering it is a computer generated printout, it cannot be looked into since no certificate under Section 65B of the Evidence Act, has been filed by the Respondent.

30. Respondent has also placed on record one document marked as Exhibit No.8 in US Trial Court which is stated to be*"Inspection point"*. However, a bare perusal of the same shows (a) it is undated, unsigned and unstamped (b) it does not reflect that it relates to the incinerator in question or the vessel in question namely "Eagle Austin" (c) it does not give any clearance or approval on the alleged inspection.

31. Similarly, Ex.No.8 gives some measurement of the ship's condition for the years 1998-2002. Even this document nowhere mention anything about the incinerator in question or to the vessel namely

"Eagle Austin" (b) the documents purportedly reflect on ship's condition under the table "ships condition" (c) the documents do not support the version of the Respondent that the incinerator was inspected on 5.11.1999 as is claimed by it.

32. The evidence on record establish that the Claimant was on the ship 53 days before his accident, his joining being on 25.9.1999 and accident having occurred on 13.11.1999. On the morning of the accident, Claimant was instructed by the Second Engineer to accompany the electrician Ranjit Budwal to learn how to use the waste incinerator on board the ship. The electrician Ranjit Budwal testified that he demonstrated to the Claimant how to use the incinerator but told him not to operate it himself and further that the second engineer had instructed him just to show them *"how they were burning the garbage in the incinerator just to make them familiarize with the incinerator"*, meaning thereby, that the Claimant was not formally trained or equipped to operate the same. According to the testimony of the Claimant, Ranjit Budwal instructed him on the basic operation and then watched him put several loads of garbage into the hopper door of the incinerator and complete the operation. Claimant then informed the engineer that there was some garbage at the bottom deck and that he needed to go and bring it up so he went down to the engine room to retrieve more garbage and returned to the incinerator to find it unattended - Ranjit Budwal having left. Claimant attempted to burn the garbage on his own and when he placed a plastic bag full of oily rags and residue in the incinerator, it flashed back and burned him severely. After only one operation while Ranjit Budwal watched, Claimant was thus, left to his own to the burn the garbage into the incinerator.

33. The evidence on record also proves that the incinerator itself was defective, its hopper flap could not be fully closed and the interlock

system on the incinerator should have prevented its operation without the hopper flap fully closed and thus it had a defect which contributed to Claimant's injuries. In nutshell, thus, the evidence indicates that there was a defect in the incinerator itself which allowed it to be used without the hopper flap fully closed and the interlock system did not operate rendering the vessel unseaworthy due to the defective condition of an appurtenance of the ship. As per Chief Engineer Ravi Shankar's Statement of Facts, *"the flap was not closing fully 100% as some garbage and a broken piece of bolt was found between flap and casing. This was removed"* and *"Further, it's a wonder how he could have opened the hopper door incase the flap was partly open"*. Thus, as per the Chief Engineer, the hopper flap could not fully close due to presence of a broken bolt and he could not explain how the incinerator could have operated with the bolt preventing full closure of the flap as its interlock system should have prevented the hopper door from being opened if the flap or the sluice door which opens to permit the garbage to move from the hopper to the combustion chamber was not fully closed.

34. The evidence on record also proves that the safety alarms of the incinerator had been disabled. We have the deposition of the Claimant who deposed that the alarms used to be disabled so that it didn't bother everybody else who was working somewhere else in the engine room and that on the day of the incident he saw the second engineer disabling the alarm from the ECR computer monitor. His testimony has remained unshaken during cross-examination and in fact no suggestion has been put to him that what he has deposed with regard to the alarm systems being disabled is false. There is also the deposition of Mr. Pawan Sirohi who testified that at times the Respondent used to shut the alarms from the engine control room and there were some alarms that

came when incinerator was started but that they had been bypassed or switched off before we start it.

35. In support of its submission that the incinerator was free from any defects and its condition, the Respondent had produced Mr. Donald C. Burnham as an expert witness. However, his testimony does not help the respondent as he admitted that he had never sailed on any ships with incinerators. During his cross examination, he further admitted that he did not have any specialized knowledge, training or experience in incinerator designs. He also admitted that the alarm from the control room could be silenced. He also opined and agreed that the Claimant was not adequately trained to be operating the incinerator on the day of his accident.

36. As per the Respondent, it was its policy prior to and at the time of Claimant's injury that assistant engineers/cadets were not to use vessel machinery including incinerator unless under direct supervision of a senior engineer or the ships electrician and that this policy was discussed in weekly safety meetings which Claimant was required to attend along with other members. As per the Respondent, thus, the Claimant was to be blamed for his own injuries inasmuch as he should not have undertaken to load flaming cleaning liquids into the incinerator without the superiorspresence and that it was Claimant's own negligence that caused the malfunction of the incinerator.

37. It is pertinent to note that the respondent has not placed on record any existing policy either prior to or at the time of the incident i.e. 13.11.1999. The Respondent, however, has placed on record "Extract of the Respondent's Operations Handbook" and in relation to that, has averred that "this policy was discussed in weekly safety meetings which Claimant was required to attend with other members of the engineering department" and that "this aforesaid policy was also set out in Instructions Book for Installation-

*Operation-Maintenance of the Incinerator"*. However, perusal of the same goes to show that it is dated 1.9.2002 whereas the incident in question occurred on 13.11.1999, thus, cementing the stand of the Claimant that there was no policy in place before or at the time of the occurrence i.e. 13.11.1999. No evidence has been put forth by the Respondent to prove that there were weekly safety meetings or that *Instructions Book for Installation-Operation-Maintenance of the Incinerator* was ever shared, discussed or explained to the Claimant. There is also no record of any such alleged meeting, its attendees and its agenda being discussed in such alleged safety meetings.

38. In fact, the subsequent letters dated 19.01.2000 and 24.01.2000 weakens the defense of the Respondent.The relevant portion of letter dated 19.1.2000 reads as under:

*"One of the ship staff recently suffered extensive second degree and third degree burns resulting from backfire of incinerator.*

*An in-house inquiry was conducted <u>and Shipboard Training of incinerators have been included in the training plan</u> as per QMS/Memo"*

**And further:**

*"Nobody on the vessel, operating the incinerators for the first time, should be allowed to do so without proper supervision.*

**Also:**

*All efforts must be made to ensure that the person operating incinerators is very well familiar with the equipment prior to operating the same.*

Thus, a bare perusal of the aforesaid letter of 19.1.2000 clearly shows that (a) Shipboard training of incinerators was never part of the training plan and was decided to be included in the training plan only by this letter/circular of 19.1.2000 (b) Prior to the issuance of this letter, incinerators were being operated even

without proper supervision and by persons not familiar with its operations. It may be noted that the said circular/letter of 19.1.2000 was even admitted by Ranjit Singh Budwal during his cross examination.

39. Another letter dated 24.07.2000 was issued after 8 months of the claimant's accident when another crew member sustained injuries while operating the same incinerator. Relevant portion of letter dated 24.7.2000 reads as under:

*"We would like to remind all C/E and 2/E on the need to ensure proper instructions are given to those operating the incinerator. This need has been promulgated through circular ALL/VSL/355 dated 19 Jan 2000. Master and C/E are reminded to comply with the circular to prevent another incident".*

A bare perusal of this portion goes to show that reference was made only to the afore-mentioned circular of 19.1.2000, thus, clearly implying that there was no circular/policy etc which was in place at the time when the Claimant sustained injuries on 13.11.1999.

40. In fact, both the above referred letters i.e. 19.1.2000 and 24.7.2000 do not mention anything about weekly safety meetings or any other policy which was in place, thus, clearly demolishing the defense of the Respondent with regard to alleged policies or weekly safety meetings or any training being imparted to the Claimant on operation of incinerators.

41. Moreover, reliance has been on "Report of Injury" written by Brig. Satish on the date of the incident i.e. 13.11.1999 relevant portion of which reads as under:

*"2.Causes*

*Unsafe working practices*

*3.Correct Action:*

*Will convene a safety meeting ASAP and highlight to entire ship staff procedures to adopt for the above task and measures to be taken to prevent a recurrence.*

*Our database indicates this to be the second instance of burn injury related to incinerator operations"*.

This report also lends assurance to the version of the claimant that not only was it the second instance of a burn injury on the same vessel while operating an incinerator but also that there were no procedures which had been adopted so far on the ship to prevent such injuries.

42. The Claimant, in his cross-examination, maintained that there were no policies, operations or safety manuals which were shared, discussed or made available to him. This was corroborated by the deposition of Mr. Pawan Sirohi who deposed that **(a)** it were the cadets who used to put garbage in the incinerators **(b)** there were no instructions given to the cadets that they were not supposed to touch the incinerator **(c)** at times the Respondent used to shut the alarms from the engine control room **(d)** there were some alarms that came when incinerator was started but that they had been bypassed or switched off before we start it. **(e)** The garbage and oily rags from engine room are usually burned in the incinerator.

43. Pursuant to a question put to Mr. Pawan Sirohi that the rule on the ship is that the incinerator shall not be operated by the cadets unless under supervision of the engineer or the second engineer, he replied that the policy was not being followed on the ships. He further stated that at times the cadet is the one who is putting the garbage in the incinerator and this is something that happened on the Eagle Austin. He further testified that it is normally the second engineer and electrician who are physically present with the cadets but sometimes they are not there. They just ask to put the garbage

into the incinerators, the cadets do that later on so that they can burn it.

44. It is the case of the respondent that dry garbage used to be burnt in incinerator, oil garbage used to be burnt in pipeline and it is alleged that the claimant misused it by pouring liquid in it. As per **Clause 7.4.5** of the said "Operations Handbook" dated 01.09.2000 even waste oil could be burnt and incinerated. To the same effect, is the "Instruction Book for Installation-Operation Maintenance" filed by the Respondent which stipulated that *"the incinerator is designed to combust solid waste and/or oil. The heat from the primary burner will try out and start burning the solid waste and/or ignite the sludge oil"* meaning thereby, that even liquids could be incineratedthus, clearly demolishing the defense of the Respondent that there was misuse of the incinerator by the Claimant.

45. It is the case of claimant that the alarms had been disabled before the accident. **Clause 7.4.4** of the "Operations Handbook" stipulated that all alarms and switches would be checked on a weekly basis and would be recorded in the Saturday Routine Book. However, the respondenthas failed to produce routine books to demolish the case of the claimant that the alarm of the incinerator had not been disabled. Thus, the best evidence was held back by the respondent and an adverse inference has to be drawn against it.

46. The aforesaid evidence and the depositions on record clearly establish that the accident occurred and injuries were sustained by the Claimant.Even if it is taken that the claimant was only a cadet and he should not had undertaken to load flammable liquid into the incinerator without the presence of supervisor even then there is ample evidence on record to show the un-seaworthiness of the vessel inasmuch as the incinerator so installed in it was defective, the safety alarms had been disabled, there were no policies which

were in place nor was there any formal training or instructions that had been imparted to the Claimant. No suggestion was put to the Claimant during cross examination (a) that alarms had not been disabled (b) that he had in fact been imparted with proper training or that operations manuals, safety procedures etc. had been discussed during any meetings (c) that the engineer had not asked him to collect more garbage and put it in the incinerator as deposed by the Claimant. Under the circumstances, it cannot be said that the accident had taken place due to sole negligence of the claimant. At the most, it can be taken as a case of contributory negligence. This issue is decided accordingly.

### ISSUE No. 2:

47.  Ld. Counsel for the claimant submitted that the applicable law is the general maritime law and the US Jones Act, as the claimant executed his shipping articles and signed on the vessel in the United States at Corpus Christi Texas. The entirety of the claimant's service on the vessel until the time of his injury was back and forth to US ports in Texas and Louisiana and the Respondent's breach of duty of cure on board the vessel took place in US waters in the State of Louisiana. That being so, there is no basis to apply Indian Law. It was not denied that the claimant was and continued to be the resident of Faridabad. It was also not denied that the deed of employment had an arbitration clause which provides for either Singapore or India as a venue but submitted that it permitted the company to commence proceedings in any other jurisdiction, if considered appropriate. The substantive law of India has no logical application to claim arising from maritime service in other countries. None of the Claimant's service occurred in India, or even on a vessel serving an Indian Port. No entity involved in the ownership,operation or underwriting of the

M/T Eagle Austin is an Indian Corporation.Counsel further submitted that the applicable provision of the Arbitration and Conciliation Act, 1996 is sub Section 28(1)(b) as this matter is an international commercial Arbitration. Since the Deed did not designate a substantive law, as per Section (3) the Tribunal is to take into account the usage of the trade applicable to the transaction. In the business of International Shipping,the location of a maritime tort or other casualty routinely controls the determination of the applicable law. In this case, the most significant contracts are with the United States where the claimant signed his shipping article and joined the service of the vessel. Reliance is placed on **Infowares Ltd. Vs Equinox Corporation (2009) 7 SCC 220 and Reliance Industries Ltd. Vs. Union of India** AIR 2014 SC 3218.

48. Ld Counsel for the Respondent, on the other hand, submitted that the law prevailing in India which regulates the compensation payable to injuries sustained by Trainees/ Apprentices and not Jones Act/American Law have any application in India.Counsel further submitted that the claimant is/was resident of Faridabad, Haryana, India.He executed the deed of employment dated 13/09/1999with the Respondent at India which is still valid and subsisting and contains arbitration clause.

49. Moreover, Section 28(1) (a) of the Arbitration and Conciliation Act, 1996, clearly states that where procedural law is Indian Law, the substantive law shall also be Indian law. The venue of Arbitration proceedings is India, therefore, Indian Law will determine the rights , liabilities and duties of the claimant and the Respondent and not American or Singaporean Law as alleged by the claimant. Reliance is placed upon **National Thermal Power Corporation Vs. Singer Co. &Ors.**(1992) 3 SCC 551, where it was observed as under :

*"In the absence of an express statement about the governing law, the inferred intention of the parties as a whole determines that law. Where there is no express choice of law governing the contract as a whole, or the arbitration agreement in particular, there is, the absence of any contrary indication, a presumption that the parties intended that the proper law of the contract as well as the law governing the arbitration agreement are the same as the law of the country in which the arbitration is agreed to be held. But that is a rebuttable presumption. The true intention of the parties, in the absence of an express selection, has to be discovered by applying "sound ideas of business, convenience and sense to the language of the contract itself".*

*For this purpose the place where the contract was made, the form and object of the contract, the place of performance, the place of residence or business of the parties, reference to the courts having jurisdiction and such other links are examined by the courts to determine the system of law with which the transaction has its closest and most real connection."*

## Consideration :

50. It is undisputed case of the parties that the claimant is a resident of India. A deed of employment dated 13th September 1999 was executed between the claimant and Respondent in India. The same provides for reference to arbitration of any dispute arising out of and under the aforesaid deed of Employment, which constitutes a valid, subsisting and binding arbitration agreement between the parties. Clause 6 of the Deed of Employment dated 13th Sept 1999 provides:

*"Any dispute arising out of this agreement shall be subject to arbitration under the Arbitration and Conciliation Act 1996.The said proceedings shall*

> *take place either in Singapore or in India at the*
> *option of the company."*

51. Where procedural law is Indian Law,the substantive law shall also be Indian Law. Moreover, since the arbitration agreement is silent on the choice of substantive law governing the contract, as held in **National Thermal Power Corporation (Supra)** it has to be presumed that the parties have adopted the law of the country where the arbitration has been agreed.Moreover, as stated above, the claimant is an Indian Citizen. The Deed of Employment dated 13th September 1999 between the parties to the arbitration was executed in India,pursuant to which the claimant was employed on Respondent's vessel.It is under this contract of employment executed in India,the claimant is claiming compensation. The choice of forum was expressly agreed to by the parties hence all the disputes arising under this agreement are required to be decided as per Indian Law. Moreover, as per the Deed of Employment, the disputes are to be decided as per Arbitration and Conciliation Act 1996 hence even otherwise, it does not appeal to reason that procedure prescribed under this Act will govern the parties but substantive law of other country will govern the parties more particularly when there is no such agreement between the parties.

52. It is a matter of record that court of Louisiana USA awarded damages in favour of the claimant.On appeal filed by the Respondent, the appellate court remitted the matter to the District Court with a direction to stay the matter till the pendency of arbitration proceedings relying upon the arbitration clause in the Deed of Employment which was signed in India.

53. **Infowares Ltd (Supra) and Reliance Industries Ltd (Supra)** does not help the claimants as the facts and issues for determination in the aforesaid judgments are different from the facts of the present

matter. In the aforesaid judgments, the issue before the Court was whether the Indian Courts would have jurisdiction when the governing law of the contract were the laws of USA.

54. The plea of the claimant that he was injured while the vessel was in US territorial water has been disputed by the Respondent by alleging that the injury occurred while the vessel was operating in International water. Reference has been made to the Master's log entry for the date of claimant's accident to show that the vessel was located at the time of accident at Latitude 23 degrees 06'(N)and Longitude 091, degrees 49'(W) which placed her in the middle of the Gulf of Mexico and about 383 nautical miles from Louisiana. It is alleged that this is far beyond the scope of US territorial water which at most extends 12 nautical miles from the US Coast. The mere fact that after the claimant's accident the vessel's next port of call was in the State of Louisiana in the United States does not mean that the law prevailing in that state will govern the parties.Noneof the parties to this dispute is a citizen or resident of United States.

55. Keeping in view the fact that the claimant was/is a resident of India;Deed of Employment was executed at India which provides for resorting to arbitration in case of any dispute between the parties either at India or Singapore, the choice of forum was expressly agreed to by the parties, disputes were to be decided as per Arbitration and Conciliation Act, 1996, arbitration proceedings have been initiated at India, hence the disputes are to be decided only as per the Indian law. This issue is decided accordingly.

**Issue No. 3:**

56. Claimant has made seven claims in the claim petition and issue no.3 pertains to claims No. A to E.As such, the claims shall be dealt with seriatim wise.

(i) _**Pain and Suffering and 27% permanent impairment to the body**_

57.   In order to substantiate his claim, the Claimant testified that when he put the garbage in the incinerator a huge flame came out. He ran for help but passed out. When he woke up, engineers were standing around him and he was in really bad pain. He walked up to the ship's hospital on the upper deck and was put on ice and given pain killers.

58.   It is the Claimant's case that the injuries so sustained by him were worsened by Respondent's breach of its obligations to provide appropriate medical care. Claimant's burns were sufficiently severe to necessitate immediate medical treatment in hospitals specializing in treatment of burns. Respondent breached this obligation by (a) not only making a false assessment of the extent and severity of his injuries as first degree, thus superficial but (b) by failing to have the Claimant evacuated from the vessel immediately by helicopter.

59.   The Claimant thus, was kept on the vessel and treated only with pain killers for an additional 36 hours while the vessel continued its voyage to its next scheduled port of call at Empire, Louisiana. Treatment of the Claimant was thus, unnecessarily delayed for 36 hours on high seas and 3 hours in Louisiana waters before helicopter transportation was accomplished only from the dock at the port, that too on the advice of a SOS Doctor, requiring Claimant to undergo unnecessary pain and suffering. Additional delay in institution of intravenous antibiotics contributed to Claimant's contraction of an infection which not only delayed healing process but also necessitated additional treatment which would have been unnecessary with timely evacuation and expert medication. Claimant's enhanced injuries, prolonged medical treatment and avoidable physical and mental agony was directly attributable to

the callousness and negligence of the Respondent and its employees.

60.   At the Baton Rouge General Medical Center, the Claimant was examined by Dr. John Williams, a plastic surgeon who found the Claimant to have second and third degree burns over 39% of his body involving the left hand and forearm, the right hand and fingers, and portions of both legs, including the back of both thighs.He was discharged from Baton Rouge General and began rehabilitation at the Marine Medical Unit in New Orleans, until being returned to India on December 22, 1999. Thereafter, he was sent to Singapore for follow up treatment. There he underwent two surgical procedures to repair "webbing" of his fingers from the scar tissue left from his burns. This scar tissue was cut and skin grafts were performed.Hewas advised regarding his continued burn rehabilitation therapy.

61.   He was also treated by the psychologists for problems associated with this accident and has been diagnosed as suffering from post traumatic stress and disorder and major depressive disorder. Reliance has been placed on **Hanuman Dass v Usha Rani AIR 1978 P&H 177, Jugal Kishore v Rai Singh 22(1982)DLT294, G. Ravindranath v E. Sriniwas 2013(12)SCC455, Sanjay Verma v Haryana Roadways 2014(3)SCC210, RD Hattangadi v Pest Control India P. Ltd 1995ACJ366(SC), The Divisional Controller v MahadevaShettry AIR 2003 SC4172.**Reliance is also placed on many reported cases dealing with burn injuries, for instances, **Thompson V. Petrounited Terminals Inc., 88CA0488, Ayres V. Beauregard Electric Cooperative Inc., 94-811, Casanova v. Ballard, 87 CA 0788, Fuseliar v. Amco Production Company 91/658(La.App.3Cir. 11/4/92); 607So2d1044, Miller v. Louisiana Gas Services Company, 91-CA-890(La. App. 5 Cir. 5/15/92); 601 So 2d 700, Thomas v. State, Department of transportation and**

**Development 27203-CA ((La. App. 2 Cir. 10/12/95); 662 So. 2d 788.**

62.   The Respondent, on the other hand, has set up a defense that it maintained a contingency plan for personal injuries and emergency situations and as part of that plan, it maintained a contract with land based service namely "Asia Emergency Assistance" (AEA) which provided professional medical advice via radio on 24 hour basis. Accordingly, the Master of the vessel immediately contacted AEA and received directions regarding first aid and administration of medications including pain killers and antibiotics. All other instructions from AEA were immediately carried out on board. The Respondent has also asserted that it was its company policy that if helicopter evacuation was possible and was recommended by independent medical professionals, then it would have been provided regardless of costs. In this case, medical advice given to the Master was to keep the Claimant on vessel because the vessel was approaching a port and there was concern that it would be more harmful to transfer the Claimant from a vessel to a helicopter and that it was medical advise that the Claimant should not be air-lifted from the vessel but should wait for the ship to dock at the port. The decision of when and how to evacuate the Claimant from the ship was made on the basis of the recommendations from the physicians of AEA with whom the master was in constant communication.It was further submitted that claimant's own treating physician testified that he too would have described claimant's injuries as "superficial" if he had seen them on the ship. The claimant was air lifted by helicopter to a hospital specializing in burn injuries immediately upon the vessel being made fast at the dock. The burn unit at the Baton Rouge Medical Centre in Baton Rouge, Louisiana is one of the most advanced burn treatment facilities in the South Eastern United States and the claimant's was

arranged and paid for by the respondent. In fact, respondent has paid for all of claimant's medical care, including flying him to Singapore for cosmetic surgery.

**Consideration** :

63.    As regards the plea of the claimant that his injuries were under assessed and immediate evacuation by helicopter was not done, there is the testimony of Chang Joo Huat, representative of the respondent that where evacuation is recommended, same is always done. As far as there is human life vs. cost, cost have never been a question. Moreover, Dr. John Williams testified that he might have assessed him in the same manner saying that they appear to be superficial or relatively superficial because of the fact that burns subsequently over a period of time often progress. The diagnosis on the ship of claimant's injuries being superficial was the same, he would have described it at the time and was accurate. He also stated that he could not say if an earlier evacuation from the ship would have lessened the chance of claimant developing infection.

64.    However, the fact remains that at Baton Rouge General Medical Centre when the applicant was examined by Dr. John Williams, he found the claimant to have the second and third degree burns over 39% of his body involving the left hand and the forearm, the right hand and fingers, and portions of both legs, including the back of both thighs. Dr. Williams described the burns as "deep" second degree burns meaning deep burning down to the second layer of the skin with blistering, and third degree burning which entailed deep burning through all of the layers of dermas down to the fat tissue involving damages to the sweat glands.  Dr. Williams began treating him for his burn injuries which included IV's morphine and antibiotics and daily debridements, which are non-surgical removal

of burned tissue. Dr. William described this as a very painful procedure of the taking of scrub brushes and the actual scrubbing off of non-living tissue and scabs. On November 19, 1999, skin graft procedures were performed on Dahiya's right arm, with the donor skin taken from his left thigh. On November 24, 1999 a second graft was done for repair of burns to both thighs and right lower leg. These grafts were taken from back and buttocks. Skin grafts are attached to the body with stainless steel staples. Claimant was discharged from Baton Rouge General on December 8 and began rehabilitation at the Marine Medical Unit in New Orleans where he was recommended 'Reconstructive surgery'. He returned to India on December 22, 1999. Thereafter, he attempted to return to sea but failed. He was sent to Singapore for follow up treatment. There he underwent two surgical procedures to repair 'webbing' of his fingers from the scar tissues left from his burns. This scar tissue was cut and skin grafts were performed. Dr. William testified that the Claimant would have limitation of motion on account of skin grafts having been performed on him. Dr. Williams has further testified that Dahiya will need surgery in the future to correct the scarring and reptilian appearance of his skin. These procedures may take the form of micro-dermabrasion, sheet skin grafting, or laser surgery. Additionally according to Dr. Williams, Dahiya has residual and permanent problems including sensitivity to heat and cold, his sweat glands are gone from burned skin and he has lost his body's ability to regulate heat and he is now more sensitive to the sun. While the prior treatment has been effective both functionally and aesthetically, the scaring is permanent.

65.  Claimant was also treated with the psychologist for problems associated with this accident. He was diagnosed as suffering from post traumatic stress and disorder and major depressive disorder.

He has experienced nightmares where he is engulfed in flames, flashbacks to the accident, suffers from fear and dread for his future and is angry and resentful as a result of this incident and its aftermath.According to his clinical psychologist, Kim E. Van Geffen, Claimant had symptoms of Post-Traumatic Stress Disorder and major depressive disorder and had a decreased ability to function due to his mental condition. He is in need of up to 2 years of weekly treatments but is minimizing his condition and is unwilling to begin treatment out of fear that he will appear weak and unable to solve his problem on his own.

66.   In _**Jugal Kishore vs. Rai Singh and others**_ **(22 (1982) DLT 294)** in para 12, the parameters for determination of compensation in cases of personal injury were set out as under:

> "*It is settled law that compensation in personal injury cases should be determined under the following heads:*
>
> **Pecuniary damages (special damages)**
>
> *12.1 (i) Expenses relating to treatment, hospitalization, medicines, transportation, nourishing food and misc. expenditure.*
>
> *12.2 (ii) Loss of earnings and other gains which the injured would have made had he not been injured, comprising:*
>
> *(a) Loss of earning during the period of treatment*
>
> *(b) Loss of future treatment on account of permanent disability*
>
> *12.3 (iii) Future medical expenses*
>
> **Non pecuniary damages (general damages)**
>
> *12.4 (iv) damages for pain, suffering and trauma as a consequence of the injuries*
>
> *12.5 (v) Loss of amenities (and / or loss of prospects of marriage)*
>
> *12.6 (vi) Loss of expectation of life (shortening of normal longevity)*"

*The judgment further provides that "in routine personal injury cases, compensation will be awarded only under heads (i), (ii) (a) and (iv)*

*It is only in serious cases of injury, where there is specific medical evidence corroborating the evidence of the claimant, that compensation will be granted under any of the heads (ii) (b), (iii), (v) and (vi) relating to loss of future earnings on account of permanent disability, future medical expenses, loss of amenities (and / or loss of prospects of marriage) and loss of expectation of life."*

67.   Respondent himself has relied upon **Yadav Kumar Vs. National Insurance Commpany Ltd. & Anr. (2010) 10 SCC 341** where it was held by Hon'ble Apex Court that while assessing compensation in accident cases, the court or the tribunal must take a reasonably compassionate view of things. The courts are statutorily charged with a responsibility of fixing "just compensation". It is true that determination of a just compensation cannot be equated to a bonanza. At the same time the concept of just compensation obviously suggests that the application of fair and equitable principles and a reasonable approach on the part of the tribunals and the courts. They should be guided by principles of good conscience so that the ultimate result becomes just and equitable. It was further held the courts must be liberal in determination of quantum of compensation, and not niggardly in as much as in a free country, law must value life and limb on a generous scale. The court or the Tribunal must take a reasonably compassionate view of things.

68.   Substantially similar view was taken in **K.Suresh Vs. New India Assurance Company Ltd. & Anr. (2012) 3 Guj 632, R.D. Hattangadi Vs. Pest Control (India) Pvt. Ltd. &Ors. (1995) 1 SCC 551**, relied upon counsel for both the parties.

Applying the ratio of these judgments to the factual matrix of the present case, the testimony of the claimant which finds substantial corroboration from medical evidence makes it clear that because of the accident, the claimant who was only 18 years old cadet aspiring to work on ship has suffered immensely on account of the injuries sustained by him. It is really difficult to assess the exact amount of compensation for the pain and agony suffered by him. That is why, it has been said by courts that whenever any amount is determined as to compensation payable for any injury suffered during an accident, the object is to compensate such injury 'so far as money can compensate' because it is impossible to equate the money with the human suffering or personal deprivation. Money cannot renew a broken and shattered physical frame. Moreover as held in **K. Suresh (Supra)** one has to keep in view the sufferings of the injured person which would include his inability to lead a full life, his incapacity to enjoy the normal amenities which he would have enjoyed but for the injuries.

69. The very fact that the claimant had to undergo several surgeries atBaton Rough Medical Centre and then at Singapore and could return to work only after several months of the accident itself is sufficient to perceive the immense pain and sufferings undergone by the claimant. Moreover, as per the medical opinion claimant will have permanent problems including sensitivity to heat and cold. Therefore he will not be able to enjoy the amenities which he would have enjoyed but for the injuries. He has also testified that prospects of his marriage has become bleak with many rejection. It is true that all the medical expenses for the treatment were borne by the respondent but for the pain and suffering, claimant is entitled to compensation.

70. It has also been established that due to injuries sustained by the claimant he has suffered 27% partial disablement to his body

including physical limitations and residual problems with sweating, bleeding and itchiness, depression and chronic post traumatic stress disorder, the permanent scarring and disfigurement for which also he has to be compensated. It is pertinent to note that before the appellate court. "Liability findings" given by the District Court were not challenged by the respondent.

(ii) **Future Medical Treatment**

Claimant has made a claim for undergoing and need to further undergo procedures to correct the appearance of his skin.

71. This claim is opposed by the respondent on the ground that there has not been any necessity of any future medical treatment nor is there any averment even of any further medical treatment having been undergone by the claimant. No evidence has been led by the claimant that he has sought medical care of any kind related to this incident since August 2000 – a period of almost 19 years. Reliance was placed on the testimony of Dr. John Williams who stated that the treatment given to the claimant at Louisiana & Singapore were a "good outcome" and "he has a good functional result in the grafts and the grafts remain functions of his extremities"

**Consideration :**

72. Although it is true that claimant has not led any evidence regarding any treatment taken by him post August 2000 but Dr. John Williams had testified that claimant will require treatment in future and will need surgery to correct the scarring and reptilian appearance of his skin. When he went to Singapore, and undergone two surgical procedures to repair 'webbing' of his fingers from the scar tissue left from his burns, he was advised regarding his continued burn

rehabilitation therapy.  In his affidavit-evidence, he has stated that he continues to undergo treatment in terms of the medical advice prescribed by the doctors including Dr. Williams since the year 2000.  Till date, he continues to use Duolin Respulses along with breathing apparatus for respiratory problems and ointments for scars treatment etc. While the cost of these procedures may vary and the total expenses will depend on what procedure he decides to undergo, some remedial work is necessary.

(iii) & (iv) **Loss of earning & denial of his chosen vocational pursuits**

73.  As regards, loss of earning and denial of his chosen vocational pursuits, it is the case of the claimant that he was just 18 years old when we met with the accident. Past wage loss to the time of trial was established by expert testimony to be $54,988.00 while future wage loss is difficult to determine based on the facts that Claimant desires to complete his degree, get an MBA and get a decent job in the US and apply for citizenship in the US. The Claimant has been conscientious about improving himself through education, plans to work in the computer field where there is air condition instead of heat of the engine room and will undoubtedly enjoy a much better life-style once his education is complete, that process will take some time. In the meantime he lives in relative poverty and is denied his chosen vocational pursuit.

74.  The Respondent has argued that the Claimant recovered well and in the year 2000, he returned to work on Eagle Aries, another vessel of Respondent and was also able to perform all duties without restriction and had no ongoing problems or symptoms as a result of the accident on Eagle Austin. In 2001, Claimant after repeated warnings was terminated by Chief Engineer of Eagle Aries because of his refusal to follow instructions and his inability to get along with fellow crew members. Chief Engineer of Eagle Aries

issued a letter dated 10.1.2001 to Claimant giving strict warning in writing for his failure to improve his conduct and to follow company guidelines and instructions from senior officers. Since there was no improvement, he was relieved from his duties.

75. It is further the case of the respondent that the claimant did several jobs since March 2001, developed interest in computers, was employed part time at New Orleans Grand Palace Hotel, attended festivals etc. hence he is not entitled to any claim.

76. As regards signing off on 10th Jan 2001 from Eagle Aries by the respondent, it is the case of claimant thatthe said early signing off from the vessel was forced upon the Claimant because of his physical inability to completely perform his job responsibilities as he used to perform prior to the date of accident. The letter of 10.1.2001 relied upon by the Respondent is alleged to be forged and fabricated. It is alleged that it was neither served nor received by the Claimant. In support of this plea, reliance is placed on various good character certificates titled as "Testimonial for Sea Service" including a certificate dated 4.2.2001 issued and signed by the same Chief Engineer, Amrit Bhardwaj who is alleged to have issued the alleged letter dated 10.1.2001.

**Consideration :**

77. Record reveals that after the incident claimant joined another vessel of the respondent namely Eagle Vela on March 01, 2000 but his effort lasted only 5 days before he had to leave the vessel due to inability to withstand the heat of the engine room. Thereafter he was sent to Singapore where he received further treatment for his burn injuries. Once again, he signed on Eagle Aries in 2001. However, he was run off the vessel by the Chief Engineer on 04.02.2001. There is however, a dispute as to why the claimant was signed off from the vessel. According to respondent, he had to be signed off on 10th January 2001 on account of his conduct and

refusal to follow orders from the superiors whereas according to claimant the said early signing off from the vessel was forced upon the Claimant because of his physical inability to completely perform his job responsibilities as he used to perform prior to the date of accident. The fact remains that thereafter he did not join any vessel.

78. As regards submission of counsel for the respondent that the claimant developed interest in computers, pursuant to a question put to the claimant as to what field he planned to work in, he answered "Computers. **Some kind of office job where there is air condition instead of the heat of the engine room and I can feel comfortableand I can do the best job I can.**" This answer is in tune with his earlier submission that when he joined Eagle Vela in March 2000, he had to leave the vessel within 5 days due to his inability to withstand the heat of the engine room. Even Dr. Williams had deposed that the claimant will have permanent problems including sensitivity to heat and cold as his sweat gland have gone from burnt skin and he has lost his body's ability to regulate heat and he is now more sensitive to sun. Due to sensitivity to heat and cold the claimant who was 18 years old at the time of the unfortunate incident and had aspired to work on vessel had to adopt other pursuits to earn his livelihood. The very fact that he had worked at various places shows that the claimant has not been able to settle effectively in his life. It is also his case that due to his physical inabilities his marriage prospects have also been affected.That being so, claimant is entitled to compensation for loss of earning and denial of his chosen vocational pursuits.

(v) <u>Cost of legal proceedings in the USA:</u>

79. Claimant has claimed a sum of USD 13,478 towards cost of legal proceedings in USA and in support of his claim, he has filed

original notarized letter dated 26.04.2019 issued by his attorney in USA certifying the litigation expenses incurred by the claimant during judicial proceedings in USA.

80. This claim is opposed by Respondent on the ground that the appellate court there held that the claim should not have been brought in Louisiana due to lack of jurisdiction of the court by virtue of the arbitration clause in the claimant's contract of employment.

81. Keeping in view of the fact that as per deed of employment in case of disputes, arbitration clause was required to be invoked instead of filing petition claiming damages, it will not be appropriate to award legal expenses incurred by the claimant in the trial which took place in Louisiana. As such, claimant is not entitled to this relief.

82. Next question which arises for consideration is the **quantum of damages**.

83. Learned counsel for claimant submitted that the parties and the vessel in question had the closest connection to United States of America since (a) the accident and injury took place in USA (b) The vessel was en route in US and (c) the Claimant at that time was a resident of USA, the vessel was part of Respondent's "American Eagle" fleet of oil tankers serving the Gulf of Mexico, particularly including US refineries in Louisiana and Texas, he executed his shipping articles in the USA when he joined the vessel in the USA. The vessel thus, was subject to the Maritime Laws of the USA i.e. the Jones Act. It could not be subject to the Indian Merchant Shipping Act, 1958 which as per Section 2 applies only to vessels registered in India or Employee Compensation Act or Apprentices Act, 1961. The claim may be decided as per the Merchants Shipping act, 1958.

84. On the other hand, learned counsel for the respondent submitted that claimant is not entitled for compensation. If at all, any compensation is to be paid, Indian law will be applicable to these

proceedings. Under Indian Law, compensation is to be calculated as per Employees' Compensation Act, 1923 read with Apprentice Act, 1961 and not as per Merchant Shipping Act,1958. Reliance is placed on **Capt. Subhash Kumar versus Principal Officer, Marine Mercantile Department, Madras,** reported in 1991 (2) SCC 449.

**Consideration :**

85.　A perusal of various provisions of Employees Compensation Act, 1923 would show that this Act has no application since the Ship or the Respondent Company were not registered in India as is the requirement under Section 2[dd)(ii)(d). Similarly, the Apprentices Act, 1961 too has no applicability to the case in hand since (a) the Respondent has nowhere set up a case that the Claimant was an Apprentice or was undergoing apprenticeship training in pursuance of a contract for apprenticeship. There is no contract of apprenticeship which has been sent by the Respondent to the Apprenticeship Advisor in terms of Section 4(4) of the Act (c) No records and returns have been produced by the Respondent as per Section 19 of the Act to show that the Claimant was an apprentice (d) A bare perusal of Rule (4) and Rule (14) of the Merchant Shipping (Apprenticeship to Sea Service) Rules also clearly reflect that the Apprentice Act or its rules are not applicable to the present case.

Even the Merchant Shipping Act, 1958 does not apply to present arbitration at all.Section 2 of the Merchant Shipping Act, 1958 sets out the application of the Act and provides that:

"(1) *Unless otherwise expressly provided, the provisions of this Act will apply to—*

*(a) any vessel which is registered in India; or*

*(b) any vessel which is required by this Act to be so registered; or*

*(c) any other vessel which is owned wholly by persons to each of whom any of the descriptions specified in clause (a) or in clause (b) or in clause (c), as the case may be, of section 21 applies, shall so apply wherever the vessel may be.*

*(2) Unless otherwise expressly provided, the provisions of this Act which apply to vessels other than those referred to in sub-section (1) shall so apply only while any such vessel is within India, including the territorial waters thereof.*

86.   In **Capt. Subhash Kumar**(Supra) Hon'ble Supreme Court held that,

> "*The ship was not a ship owned wholly by persons each of whom was a citizen of India or by a company satisfying the descriptions under clause (b) or (c). Sub-section (2) of Section 2 makes the provisions of the Act applicable to vessels other than those referred to in sub-section (1) only while any such vessel is within India, including the territorial waters thereof. The ship being a Panamanian ship registered in Panama would come within the purview of the Act only while it is within India including the territorial waters.*"

In the instant case, neither the vessel EAGLE AUSTIN was registered in India; nor required to be registered in Indiaunder this Act; nor owned by persons to which the aforesaid description applies nor the vessel was in India including territorial waters. Hence, this Act has no application to the case in hand.

87.   Jones Act has no application to the facts of the present case in as much as the Claimant admittedly is not a citizen or a permanent resident of the United States of America at the time of the incident giving rise to the action; the incident did not take place within the territorial waters of the United States of America; the Claimant admittedly was not employed by any Enterprise involved in any

activities as set out in section 33 of the said Act. There is nothing on record to even suggest that Indian law at the time of the incident did not provide any remedy to the Claimant, who was and continues to remain an Indian citizen. Therefore, on Claimant's own showing, the Jones Act has no application in the facts of the present case and only Indian law applies.

88. Since neither Jones Act, nor Merchant Shipping Act,1958, nor Employees Compensation Act nor Apprentice Act are applicable, the principles laid down by Hon'ble Apex Court as discussed above, lend some guidance to the determination of what sum would adequately compensate the claimant for his injuries. This is particularly so in view of the broad range of damages which are possible taking into consideration the nature of claimant's injuries, pain and suffering undergone by him, loss of income and denial of his chosen vocational pursuits.

Following these judgments, claimant is awarded following damages:

1. Pain and Suffering – 50 Lacs

   27% permanent disability – 20 Lacs

2. Loss of earning &

   Loss of chosen vocational pursuits – 20 Lacs

3. Future procedures – 5 Lacs

This issue is decided accordingly.

**Issue No.4:**

89. Claimant has claimed interest @ 18% from the date of incident.Keeping in view immense pain and suffering undergone by the claimant physically as well as mentally coupled with the fact that he has suffered 27% permanent impairment to his body, suffered loss of earning and chosen vocational pursuits, he is entitled to interest as held by Hon'ble Apex Court in **Hanuman**

**Dass Vs Usha Rani** **AIR 1978 P&H 177, K. Suresh (supra)**
**Yadav Kumar (supra)** & various other cases.

90.    As regards rate of interest, although as per Arbitration &
Conciliation Act,1996 there was a provision for grant of interest @
18%, however in the light of amendment of Section 31(7) (b) of
the Act w.e.f 23.10.2015, the rate of interest has been reduced
from 18% per annum to 2% over the "current rate of interest"
prevalent on the date of award. As such claimant is awarded 6%
interest on the awarded amount minus amount awarded towards
future treatment from the date of filing claim till realisation. This
issue is decided accordingly.

**Issue No.5:**

91.    In the facts and circumstances of the case, claimant is awarded
cost of arbitration proceedings.

**Relief :**

In view of my findings on the aforesaid issues, claimant is
awarded a total sum of Rs. 95 lacs. He is also awarded interest
@ 6% on the amount of Rs. 90 lacs from the date of filing of the
claim till realisation besides cost of arbitration proceedings.
Respondent is granted two months time to pay the entire awarded
amount along with interest as mentioned above failing which
principal amount carry interest at the rate of 8% till realisation.

JUSTICE (RETD.) SUNITA GUPTA
SOLE ARBITRATOR
25.01.2020